UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| LISA GROGG, LYNFORD GROGG, GENA G. GRAHAM, and JAMES R. WRAY, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Cause No. 1:05-CV-415 TS<br>) |
| UNIVERSAL UNDERWRITERS INSURANCE COMPANY, BROOKE SAMPSON, and TAYLOR CADILLAC, INC., | )<br>)<br>)<br>)<br>) |
| Defendants, and | )<br>) |
| AUTO-OWNERS INSURANCE COMPANY, | )<br>)<br>) |
| Intervening Defendant. | )<br>)<br>) |
| AUTO-OWNERS INSURANCE COMPANY, | )<br>)<br>) |
| Counter-Claimant | )<br>) |
| v. | )<br>) |
| LISA GROGG, LYNFORD GROGG, GENA G. GRAHAM, and JAMES R. WRAY, | )<br>)<br>)<br>) |
| Counter-Defendants. | ) |

**OPINION AND ORDER**

**A. Background**

On September 14, 2004, Brian Sampson rented a car from his employer, Defendant Taylor Cadillac, Inc., for his wife, Defendant Brooke Sampson. Taylor Cadillac is located in Toledo, Ohio. Four days later, Brooke drove the car to Fort Wayne, Indiana, to attend a wedding there. The night after the wedding, she was driving the rental car just outside of Fort Wayne when she struck a car driven by Plaintiff Lisa Grogg.

At the time of the accident, Brooke had liability insurance for $50,000. Since the Plaintiffs' damages significantly exceeded that amount, they sought compensation from their own insurance carrier, Defendant Auto-Owners Insurance Company, under its under-insured driver provision. Auto-Owners refused the compensation, claiming that Brooke was not under-insured, as she was covered up to $500,000 by Taylor Cadillac's insurance provider, Intervening Defendant Universal Underwriters Insurance Company. In turn, Universal denied that its policy covered Brooke.

Having found themselves in the middle of this coverage dispute, the Plaintiffs ask this Court for declaratory relief. They request that the Court state whether Brooke was covered by Universal at the time of the accident. Presently, all parties have moved for summary judgment: the Plaintiffs argue that Universal should pay them for injuries inflicted by Brooke; otherwise, Auto-Owners should pay; Auto-Owners submits that Universal must pay, period; Universal insists that the Plaintiffs have no claim against it because Brooke exceeded the scope of Taylor Cadillac's rental permission by driving the car outside of Ohio and by driving it while intoxicated, both of which were prohibited by the rental agreement.

**B. Summary Judgment Standard**

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chi.*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials

and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Comm., Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066, 1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight

of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

### C. Material Facts

Brian Sampson is an employee of Defendant Taylor Cadillac, Inc., a car dealership located in Ohio. Brooke is Brian's wife. On September 13, 2004, Brian made an appointment with the dealership's service department to repair Brooke's car. That same day, he asked Steven Taylor, the owner of Taylor Cadillac, if he could get a substitute loaner car while Brooke's car was in the shop. Steven Taylor agreed to that arrangement.

The next day, Brian brought in Brooke's car for repair. At the end of his work day, Brian asked Sales Manager Craig Jacobs for a Standard Rental Agreement so that he could rent a car. Brian knew that the company's policy required him to fill out the agreement before he could take a car home. He read and filled out the agreement. On its front, he stated his name, address, driver's license number, and his position with the company. He indicated in a specially designated place—titled Request for Permission for Person Other than the Renter to Drive—that he was requesting permission for Brooke to drive the car. He signed the agreement as *Brian Sampson for Brooke Sampson*.

The front of the agreement stated in capital letters: TERMS ON REVERSE SIDE. One of those terms bound the renter not to drive outside of Ohio "without the written consent of Lessor." (Sampson Dep. Ex. A, ¶ 4.) Another one required that the car not be driven by anyone "under the influence of intoxicants or narcotics." (*Id.* ¶ 6g.) Finally, the contract committed the renter to

5

"EXPRESSLY AGREE[] THAT THE MOTOR VEHICLE LEASED TO HIM SHALL NOT BE OPERATED . . . in violation of any of the terms and conditions of this rental agreement." (*Id.* ¶ 6b.)

When Brian brought the car home, he did not tell Brooke about the limitations on the agreement. He only cautioned her not to eat or drink in the car.

Brian and Brooke were to attend a wedding on Saturday, September 18, in Fort Wayne, Indiana. They had planned to drive to the wedding together. However, Brian was advised on Friday that he had to work at Taylor Cadillac on the day of the wedding. When Brian went to work on Saturday, he told Sales Manager Craig Jacobs that Brooke was going to take the loaner car to Fort Wayne, for the wedding. Jacobs said and did nothing in response. Brian did not tell anyone else that Brooke would be driving to Fort Wayne.

Later that day, Brooke drove to Fort Wayne and attended the wedding. Brian joined her in the evening at the reception. He left the reception around 11:30 p.m. to go back home. Brooke was supposed to have spent the night at a hotel. However, around 2 a.m., she was driving the rental car just outside of Fort Wayne, on highway I-69, when she struck a car driven by Plaintiff Lisa Grogg.

At the time of the accident Brooke owned a car insurance policy from Progressive in the amount of $50,000. The Plaintiffs were covered by Auto-Owners Insurance Company's policy that contained an under-insured driver provision: "**We** will pay compensatory damages any person is legally entitled to recover . . . from the owner or operator of . . . an **underinsured automobile**."(Pf. Ex. I, Uninsured and Underinsured Motorist Coverage 2.)

Taylor Cadillac owned an insurance policy from Universal Underwriters Insurance Company. Universal's policy guaranteed payments for "all sums the INSURED legally must pay as DAMAGES (including punitive DAMAGES where insurable by law) because of INJURY to

which this insurance applies caused by an occurrence arising out of . . . AUTO HAZARD." (Pf. Ex. H, Universal's Insurance Policy 39.) Among other things, the policy defined as insured persons employees' household members who used the dealership's cars within the scope of its permission:

"**WHO IS AN INSURED** — With respect to the AUTO HAZARD:

. . .

(2) Any of YOUR . . . paid employees, . . . [or] a member of their household . . . , while using an AUTO covered by this Coverage Part . . . . The actual use of the AUTO must be by YOU or within the scope of YOUR permission." (*Id.* at 42.)

**D. Discussion**

In their suit for declaratory relief, the Plaintiffs ask the Court to state which insurance company is required to pay the damages in excess of Progressive's $50,000 limit. They argue that Universal is responsible because Brooke was under its coverage at the time of the accident. In the alternative, they assert that Auto-Owners under-insured motorist provision applies. Auto-Owners agrees with the Plaintiffs that Universal covered the car driven by Brooke at the time of the accident and sees no alternative to this theory. Auto-Owners submits that, when Brian asked Steve Taylor if he could get a loaner car while Brooke's car was being fixed, Brooke entered into an oral contract with Taylor Cadillac allowing her the use of the car without any limitations. Universal, on the other hand, contends that Brooke forfeited any coverage when she used the car outside the scope of Taylor Cadillac's permission by driving it outside of Ohio and intoxicated.

Regarding the alleged intoxication, Universal submitted a police report stating that the primary cause of the accident was "Alcoholic Beverages" and that Brooke's alcohol level was 0.14.

7

(DE 39–12, Indiana Officer's Standard Crash Report). Auto-Owners argues that the Court may not rely on the police report because no foundation exists as to its authenticity. The Court need not determine whether Auto-Owners is correct, as it need not rely on the police report to decide the outcome of this case. Universal is not responsible for any damages caused by Brooke's use of the car outside of Ohio as such use exceeded the scope of Taylor Cadillac's permission.

The parties agree that Ohio law controls this case, and the Court sees no reason to think otherwise. In Ohio, the interpretation of an insurance contract is a matter of law. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 652 N.E.2d 684, 685 (Ohio1995). The courts "look to the plain and ordinary meaning of the language used in the policy unless another meaning is clearly apparent from the contents of the policy." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003). "When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties." *Id.* "[I]t is well-settled that, where provisions of a contract of insurance are reasonably susceptible of more than one interpretation, they will be construed strictly against the insurer and liberally in favor of the insured." *King v. Nationwide Ins. Co.*, 519 N.E.2d 1380, 1383 (Ohio 1988).

The same principles of contractual interpretation apply to the rental agreement between Taylor Cadillac and Brian.

In order to avoid the application of its under-insured automobile provision, Auto-Owners presents some imaginative arguments. On the one hand, it argues that Brooke was not subject to any terms of the written Standard Rental Agreement because she herself did not sign it and did not even know about its existence. On the other hand, and in the same breath, Auto-Owners insists that Brooke had an oral contract with Steve Taylor, despite the absence of evidence that she ever spoke

8

with him about the subject or provided him with any consideration. According to Auto-Owners, Brian recounted in his deposition how this oral contract was formed:

| | |
|---|---|
| [Attorney] | What did you advise Steven at that time? [when Brian asked him if he could get a loaner car] |
| [Brian] | I told him that my wife's car was having some problems and that we were probably looking at purchasing another car or find out how much my wife's car was going to take to get fixed, and asked him, because my wife has, we have a six-month-old baby, the baby has some doctor's appointments, could I pick out a car that we possibly could afford and could she drive it to see how she's going to like it. |
| [Attorney] | Okay. And what did Mr. Taylor tell you? |
| [Brian] | He said "yes". |

(Auto-Owners' Brief in Response to Universal's Motion for Summary Judgment 6 (quoting Brian's deposition)). Auto-Owners explains that "[t]he first part of the oral contract is that [Brooke] 'could drive the vehicle to see how she liked it," (*Id.*); "[t]he second portion of the oral contract" comes from Sales Manager Craig Jacob's silence when Brian told him that Brooke was going to take the car to Indiana. (*Id.*) That was the entire contract, and, if one is persuaded by Auto-Owners, it is really that simple, "nothing could be plainer." *Id.* at 7.

Yet, simple as this analysis might have been for Auto-Owners, it did not specify which parts of these conversations, occurring days apart and between different persons, constituted the essential elements of a contract: an offer, acceptance, manifestation of mutual assent, consideration, and meeting of the minds as to its essential terms. *See Terrell v. Uniscribe Prof'l Servs., Inc.*, 348 F. Supp. 2d 890, 893 (N.D. Ohio 2004). This failure is understandable, as such a task would have been impossible. Since Brooke did not interact with Taylor Cadillac at all, she had neither a written nor oral contract with the dealership. Rather, the dealership entered into a contract with Brian when he completed the Standard Rental Agreement on September 14, 2004.

According to its terms, Brian was the renter of one of Taylor Cadillac's cars. He accepted

the agreement, one that was clear as to its essential terms, and promised to provide consideration in return for being able to drive the car. Brooke, being listed as a "person other than the renter," had permission to drive the rental car, but she was not a party to the contract. (*See* Sampson Dep., Ex. A.). Her inclusion as an additional driver had no effect on the terms governing the use of the car, one of which prohibited it being driven outside of Ohio without Taylor Cadillac's written consent. (*See id.*)

The September 13 conversation between Brian and Steve Taylor amounted to no more than Brian's request for permission to rent a car. Furthermore, Brian's statement to Sales Manager Craig Jacobs on the day of the wedding was not a modification of the existing contract. "In order to effectively alter the terms of a contract, a modification must satisfy the essential elements of contract formation, which include offer, acceptance, and consideration." *Expeditors Intern. of Wash., Inc. v. Crowley Amer. Transp., Inc.*, 117 F. Supp.2d 663, 668–69 (S.D. Ohio 2000). What is more, consideration must be new and distinct. *Id.* As noted above, none of this happened. There was no offer, no acceptance, and no new and distinct consideration.

At most, Craig Jacobs's silence could be construed as a waiver, *see Med. Imaging Network, Inc. v. Med. Res.*, 2005 WL 1324746 (Ohio Ct. App. 2005) ("Waiver is the voluntary relinquishment of a known right."), but even that is a stretch. Neither Auto-Owners nor the Plaintiffs have demonstrated that Taylor Cadillac gave up the requirement that Brian get its written permission before taking the car outside of Ohio. Furthermore, no evidence exists that Craig Jacobs had any authority to waive that requirement or that he was empowered to authorize the car's use outside of the state.

Consequently, the Court finds that Brooke was acting outside the scope of Taylor Cadillac's

permission when she drove the rental car to Indiana. Having done so, she ceased being "an insured" under Universal's terms of coverage and assumed all risks associated with the operation of the car. The insurance contract states this much on its face: "We will pay all sums the INSURED legally must pay as DAMAGES," (Pf. Ex. H, Universal Insurance Policy 39) but the insured's "use of the AUTO must be . . . within the scope of [Taylor Cadillac's] permission," (*Id.* at 42). Taylor Cadillac is not responsible for a renter's or his wife's actions outside the express limits of the rental agreement and, as a result, Universal is not required to pay any ensuing damages. Brooke was not "an insured" at the time of the accident. *See Gulla v. Reynolds*, 85 N.E.2d 116, 120–21 (Ohio1949) (when an insurance policy's omnibus coverage is limited to third party's actual use of car within the scope of the insured's permission, coverage will be denied when the third party's use of the car constitutes a complete departure from the scope of that permission). Consequently, if the Plaintiffs' damages resulting from the car accident exceeded the $50,000 limitation under Progressive's coverage, they may properly seek payment from Auto-Owners pursuant to its under-insured driver provision.

## CONCLUSION

For these reasons, the Court:

- denies in part and grants in part the Plaintiffs' Motion for Summary Judgment [DE 23]; the motion is denied as to Defendants Universal Underwriters Insurance Company, Brooke Sampson, and Taylor Cadillac, Inc., and granted as to Intervening Defendant Auto-Owners Insurance Company;

- grants Defendant Universal Underwriters Insurance Company's Motion for Summary

Judgment [DE 29].

- denies Intervening Defendant Auto Owners Insurance Company's Motion for Summary Judgment [DE 30]; and

In addition, the Court denies as moot Intervening Defendant Auto Owners Insurance Company's Motion to Confirm Court Deadlines [DE 42].

SO ORDERED on July 13, 2006.

                    S/ Theresa L. Springmann
                    THERESA L. SPRINGMANN
                    UNITED STATES DISTRICT COURT